FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 MAR 14 A 8: 40

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DR. VINCENT DILEO | * | |
| | * | CIVIL ACTION |
| VERSUS | * | NO. 00-0101 |
| | * | |
| LIBERTY MUTUAL INSURANCE | * | |
| COMPANY | * | SECTION "S"(2) |
| | * | |

**************************************************************************************

## PLAINTIFF'S REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO STRIKE

This reply memorandum is prompted by the thoroughly tactical nature of Liberty Mutual's "Memorandum in Opposition to Plaintiff's Motion to Strike," which attempts to justify its withdrawal of previous judicial admissions. At the time those admissions were made in December 1999, Liberty Mutual — with full benefit of legal counsel — had already 1) conducted a **two-year** investigation into Dr. DiLeo's claim through its Special Investigation Unit, and 2) made unconditional tenders to Dr. DiLeo representing NADA value for his vehicle, statutory penalties and attorney's fees for its untimely payment of the claim.[1] The Special Investigation Unit expressly determined, contrary to the position now

---

[1] Dr. DiLeo reported the claim on June 5, 1997. Liberty Mutual finally tendered funds on the claim on November 30, 1999 — nearly two-and-one-half years later, during which time Liberty Mutual thoroughly investigated the claim.

Fee_____
Process_____
X Dktd_____
___ CtRmDep_____
Doc.No. 45

taken by Liberty Mutual after it retained new counsel, that Dr. DiLeo's claim did not involve fraud. Moreover, all of the documents now used to support Liberty Mutual's belated withdrawal of its admission were already in its possession when the admissions were made — with the exception of the self-serving report of the handwriting expert.[2]

In this factual context, and especially in light of the two-year investigation which preceded the judicial admission, Liberty Mutual's contention that it was "required" to withdraw the admissions (and assert new defenses) because of some newly-discovered evidence is not plausible. Clearly, the maneuver is entirely tactical. It is equally obvious that the goal of the maneuver is not to defend against Dr. DiLeo's individual claim on the merits. Through its conditional tenders and payment of statutory penalties and attorney's fees, Liberty Mutual has satisfied a large portion of Dr. DiLeo's individual claim. However, as the Fifth Circuit recognized over twenty years ago in Roper v. Consurve, Inc., 578 F.2d 1106, 1110-11 (5th Cir. 1978), aff'd, 445 U.S. 326, 100 S.Ct. 1166 (1980), reh'g denied, 446 U.S. 947, 100 S.Ct. 2177, Liberty Mutual may not affect Dr. DiLeo's ability to serve as class representative simply by satisfying his individual claim. As Circuit Judge Rubin wrote in Roper:

---

[2] Liberty Mutual's treatment of the power of attorney examined by its expert is as troubling as it is self-serving. If, as Liberty Mutual now contends, Dr. DiLeo did in fact sign the power of attorney, why has Liberty Mutual not provided any evidence from the two purported witnesses to his signature, nor from the notary who purports to have notarized his signature? And why does neither Liberty Mutual nor its expert address or otherwise account for the fact that the notary failed to date her notarial signature — an omission which clearly indicates that the entire power of attorney was forged, as Liberty Mutual's Special Investigation Unit originally concluded after its two-year investigation?

2

> The notion that a defendant may short-circuit a class action by paying off the class representatives either with their acquiescence or, as here, against their will, deserves short shrift. Indeed, were it so easy to end class actions, few would survive.

Roper at 1110. Thus, the fact that Liberty Mutual has satisfied much of Dr. DiLeo's claim does not preclude his serving as a class representative.

It seems evident, however, that the tactical goal of Liberty Mutual's answer is to manufacture some basis to defend against class certification. In raising belated and baseless objections to Dr. DiLeo's individual claim, Liberty Mutual is clearly attempting to challenge his ability to serve as a class representative. No other tactical goal is advanced, either overtly or implicitly, by Liberty Mutual's answer — other than a determined effort to avoid the legal consequences of its judicial admission.

Given its clear tactical goal, Liberty Mutual's memorandum is all the more remarkable for the strident tone with which it lashes out at anyone who seeks to hold it to its prior judicial admissions. Liberty Mutual repeatedly accuses Dr. DiLeo of lying in connection with his claim — even though a two-year Special Investigation Unit investigation concluded there was no fraud.[3] Liberty Mutual likewise questions the motive and character of Dr. DiLeo's original counsel, David Maraldo, as he handled the negotiation of Dr. DiLeo's claim. It is in this latter context that Liberty Mutual makes its most patently

---

[3] And even though Liberty Mutual is happy to continue to accept insurance premiums from Dr. DiLeo for insurance coverage under four (4) separate policies to this very day, with annual premiums paid by Dr. DiLeo exceeding $3,000.

3

incredible assertion: that, tiring of the burden and expense of dealing with Mr. Maraldo, it "swallowed its principles" and paid the claim. In other words, Liberty Mutual would have this court believe that it judicially confessed in its pleadings not only to its underlying liability to Dr. DiLeo, but also that it handled his claim in a bad-faith manner so as to warrant the payment of statutory penalties and attorney's fees, simply because it grew weary of the claim. Liberty Mutual strains credulity by acing as though its two-year investigation into the claim had nothing to do with the positions it has taken. The admissions were true when made by Liberty Mutual in December 1999 and remain true today.

Liberty Mutual's other arguments have no more validity. It claims it is entitled to raise belated coverage defenses to Dr. DiLeo's claim — despite making tenders under its policy — for two contradictory reasons. First, it argues it did not make any tenders. Then, reversing directions, it argues it can raise coverage defenses because it can recover the tenders it made which were based on fraud or ill practices. With respect to its argument that it never actually made an unconditional tender under La.R.S. 22:658 or 22:1220, Liberty Mutual's position seems to be that since it admitted it violated both statutes and paid penalties and attorney's fees as well as the claim itself, such payments cannot be considered tenders. It is difficult to see what Liberty Mutual intends to gain by the argument, but it should suffice to say that an insurer who violated these good-faith statutes should not be heard to argue that it gains greater procedural rights due to its violations than an insurer who complies.

Liberty Mutual's second contention concerning tenders — that a tender does not preclude a coverage defense — runs aground on State Farm Mutual Auto Ins. Co. v. Azhar, 620 So.2d 1158 (La. 1993). Liberty Mutual cites two other decisions but both predate and neither survive Azhar. The first, United Services Auto. Ass'n v. Dugas, 593 So.2d 918 (La. App. 4 Cir. 1992), is cited and rejected in Azhar. The second, Gallagher v. State Farm Ins. Co., 760 F.Supp. 562 (E.D. La. 1991), was decided by Judge Sear in 1991. Judge Sear held that La.C.C. arts. 2301 and 2302 created a potential right of reimbursement for UM carriers of excessive tenders. The Azhar court, two years later, expressly held that those Civil Code articles did not create such a right of reimbursement. Azhar, 620 so.2d at 1159-60.

Finally, Liberty Mutual cites several cases at page 20 for the proposition that "ill practices" sufficient to recoup a tender may consist of misrepresentations and acts of concealment.[4] However, none of those cases are UM cases. Indeed, Liberty Mutual cites no cases where a tender was ordered returned on the basis of fraud or ill practices. Further, the term "fraud or ill practice" is a legal term of art associated with actions to nullify prior judgments. The argument has no place in the context of this case.

Liberty Mutual also justifies its wholesale substantive changes in its answer on the grounds that Dr. DiLeo's amended complaint "substantially altered Dr. DiLeo's theory of

---

[4] As noted above, Liberty Mutual's Special Investigation Unit expressly found after a two-year investigation that no fraud was involved on Dr. DiLeo's part. Only when, after hiring new counsel, Liberty Mutual decided to challenge certification did it first raise the baseless issue of fraud or misrepresentation.

the case in five important ways." See Liberty Mutual's memorandum, p. 16. The assertion is a tacit acknowledgment by Liberty Mutual that its answer contained significant substantive alterations in its position in the case — for why else would Liberty Mutual make such an assertion? The assertion is nevertheless false. Dr. DiLeo's amended complaint did not alter its theory of recovery, which has at all times been premised on the theory that Liberty Mutual's systematic reliance on a computer valuation program for total loss claims violates La.R.S. 22:658 and 22:1220. The amended complaint merely amplified but in no way changed that theory. Liberty Mutual's changes in its answer were so substantive that the pleading is more properly considered an amended answer, for which leave of court must be — but was not — sought. This argument should likewise be rejected.

Lastly, Liberty Mutual claims that Dr. DiLeo's motion to strike is untimely, notwithstanding the fact it was filed on November 21, 2000 — exactly twenty (20) days after Liberty Mutual filed the answer at issue. This argument lacks merit. Liberty Mutual contends that the twenty-day period for filing the Rule 12(f) motion to strike began on October 31, 2000, when it hand-served a copy of the answer on one of Dr. DiLeo's counsel. However, the answer was not actually filed until the next day (November 1). Thus, Liberty Mutual asks the court to hold that Dr. DiLeo's time for moving to strike its pleading began to run before the pleading was actually filed.

None of the cases cited by Liberty Mutual remotely support the proposition that, under Rule 12(f), the time period for filing a motion to strike a pleading begins to run before

the subject pleading itself is actually filed. Under Liberty Mutual's argument, its service of its answer on October 31, 2000 required Dr. DiLeo to file his motion to strike on November 20, regardless of when — or if — it actually filed the answer. If Liberty Mutual had delayed filing the answer until November 7, November 10, or even until November 21, Dr. DiLeo's motion to strike would still be due on November 20 because service had been made on October 31. Nothing in the rule itself or the cases cited by Liberty Mutual countenances such an absurd position.

The motion to strike filed twenty (20) days after Liberty Mutual's answer is timely. Even accepting Liberty Mutual's argument that the motion to strike was one day late because the twenty-day time period began to run the day before Liberty filed its answer, the motion should nonetheless be considered. Judge Livaudais in <u>Laitram Corp. v. Ok Electric Ind. Co.</u>, 1994 WL 43823, at 1-2 (E.D. La. Feb. 10, 1994), was faced with a situation where a Rule 12(f) motion to strike was filed one day after the twenty-day period had run. Judge Livaudais rejected the same argument now made by Liberty Mutual and held that a one-day delay did not preclude consideration of the motion. In so holding, Judge Livaudais distinguished the very cases relied upon by Liberty Mutual as cases involving longer delays in bringing the motion.[5] For these reasons, Dr. DiLeo's motion was

---

[5] A copy of <u>Laitram Corp.</u> is attached for the court's convenience.

timely.

        Respectfully submitted,

*/s/ Scott LaBarre*

Scott LaBarre (Bar #17659)
GAUTHIER, DOWNING, LABARRE,
BEISER & DEAN
3500 North Hullen Street
Metairie, Louisiana 70002
Phone: (504) 456-8600
Richard C. Trahant (Bar #22,653, TA)
808 N. Causeway Boulevard
Metairie, Louisiana 70002
Phone: (504) 831-4357

Keith P. Richards (Bar #22564)
RICHARDS LAW FIRM, APLC
521 Europe Street
Baton Rouge, Louisiana 70802
Phone: (225) 334-9222

Steven C. Thompson (Bar #14469)
MOORE, WALTERS & THOMPSON
6513 Perkins Road
Baton Rouge, Louisiana 70808
Phone: (504) 766-1100

David J. Maraldo (Bar #24541)
4051 Veterans Boulevard, Suite 208
Metairie, Louisiana 70002
Phone: (504) 454-2769

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel for all parties via telefax, hand delivery, or by placing same in the United States Mail, postage prepaid and properly addressed, this 22nd day of January, 2001.

**Russell Yager**
**VINSON & ELKINS**
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201

**David M. Bienvenu**
**TAYLOR, PORTER, BROOKS & PHILLIPS**
P.O. Box 2471
Baton Rouge, Louisiana 70821

1994 WL 43823  
30 U.S.P.Q.2d 1527  
(Cite as: 1994 WL 43823 (E.D.La.))

Page 1

United States District Court, E.D. Louisiana.

The LAITRAM CORPORATION  
v.  
OKI ELECTRIC INDUSTRY CO., LTD., OKI America, Inc., OKIDATA, and CompUSA, Inc.

Civ. A. No. 93-0908.

Feb. 10, 1994.

RULING ON MOTION

LIVAUDAIS, District Judge.

*1 This matter is before the Court on the motion of plaintiff, the Laitram Corporation ("Laitram"), to strike certain affirmative defenses and counterclaims by defendants OKI America, OKIDATA, and CompUSA (collectively "defendants") relating to alleged inequitable conduct by Laitram. For the reasons which follow, plaintiff's motion is granted, and defendants are allowed twenty days in which to amend their answers and counterclaims in conformity with this opinion.

Discussion

Laitram moves pursuant to Rule 12(f) of the Federal Rules of Civil Procedure to strike the Seventh Affirmative Defense filed by defendants in this patent action. [FN1] Said defense states:
> Plaintiff has breached its duty of candor to the United States Patent and Trademark Office, with the result that the Lapeyre patent is unenforceable.

In addition, plaintiff moves under Rule 12(f) to strike paragraph 10 of the joint counterclaim filed by OKI America and OKIDATA, and paragraph 9 of CompUSA's counterclaim. The counterclaims are substantially similar in all pertinent respects, and state:
> [Defendants] further allege, on information and belief, that the '311 Patent is unenforceable because of Laitram's inequitable conduct in obtaining and enforcing that patent.

Laitram moves to strike on the grounds that the stated defenses and counterclaims do not satisfy the particularity requirement of Fed.R.Civ.P. 9(b). Defendants oppose on the grounds that:

(1) Laitram's motion is untimely;  
(2) the particularity requirements of Rule 9(b) are inapplicable in a patent case; and  
(3) even if Rule 9(b) is applicable, they could amend their pleadings so as to allege sufficient facts to defeat a motion to strike.

1. Timeliness of the Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that
> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within twenty days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Defendants argue that because Laitram's motion to strike was served on October 5, 1993, one day beyond the period allowed for such motion by the federal rules, the Court should not consider the motion. While plaintiff's motion may have been served outside the period prescribed by Rule 12(f), the Court believes rigid application of the deadline would be unfair under the circumstances and would not promote judicial efficiency. Numerous extensions of time have been granted throughout this litigation, and the Court feels it would be inconsistent with the nature of the proceedings to date to dismiss plaintiff's motion on the basis of a one day delay. Furthermore, it is within the Court's discretion to consider the substance of an untimely motion to strike at any time, on its own initiative. See G & H Technology, Inc. v. United States, 227 U.S.P.Q. (BNA) 491, 493 (Ct.Cl.1985) ("although Rule 12(f) states that an insufficient defense in a pleading may be stricken upon motion made by a party within 20 days after service of the pleading, it also provides that it may be stricken upon the court's own initiative at any time. Accordingly, the court may consider the substance of an untimely motion at any time."). See also Uniroyal, Inc. v. Heller, 65 F.R.D. 83, 86 (S.D.N.Y.1974) (in choosing to consider an untimely Rule 12(f) motion: "Rule 12(f) provides that the Court on its 'own motion' may consider the relief requested").

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



PLAINTIFF'S EXHIBIT  
1

1994 WL 43823                                                                                    Page 2
(Cite as: 1994 WL 43823, *2 (E.D.La.))

*2 Defendants' reliance on Schmid v. Roehm Gmbh, 544 F.Supp. 272 (D.Kan.1982), and EEOC v. Sage Realty Corp., 87 F.R.D. 365 (S.D.N.Y.1980), to support their rigid timeliness argument is also misplaced. In Schmid, the plaintiff brought its motion to strike more than two weeks after the period provided for in Rule 12(f) had expired. Schmid, 544 F.Supp. at 273. Here, Laitram's motion was served only one day after the close of the 12(f) period. In Sage Realty, the court denied the motion to strike which was filed after a responsive pleading had been filed. Sage Realty, 87 F.R.D. at 372. Here, Laitram's responses to defendants' counterclaims were filed the same day as the instant motion to strike. In addition, the Court believes that consideration of the motion to strike will promote judicial efficiency in that claims which may be frivolous or unsupported can be disposed of early. Accordingly, defendants' argument regarding the timeliness of plaintiff's motion to strike is rejected.

2. Applicability of Rule 9(b) to Patent Cases

Rule 9(b) of the Federal Rules of Civil Procedure provides in pertinent part:
> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

Plaintiff urges the Court to strike defendants' allegations of inequitable conduct because, in a patent case, such allegations are, in effect, allegations of fraud on the Patent Office. See Burlington Industries, Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed.Cir.1988) ("The charge [of inequitable conduct in the Patent Office] was formerly known as 'fraud on the Patent Office,' ..."). Because it is an allegation of fraud, plaintiff contends that the strictures of Rule 9(b) apply. Defendants, on the other hand, argue that the particularity required in common law fraud cases is not required for allegations of inequitable conduct in patent case.

While the defense of "inequitable conduct" before the Patent Office ("PTO") is broader than the defense of "common law fraud," J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc., 747 F.2d 1553, 1559 (Fed.Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 73 (1985), courts have held that "[a]llegations of 'inequitable conduct' before the Patent Office, like other allegations of fraud, are subject to the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure." Solarex Corp. v. Arco Solar, Inc., 121 F.R.D. 163, 178 (E.D.N.Y.1988), aff'd, 870 F.2d 642 (Fed.Cir.1989); see also Sun-Flex Co. v. Softview Computer Products Corp., 750 F.Supp. 962, 963 (N.D.Ill.1990) ("allegations of inequitable conduct must be measured against the standard of Fed.R.Civ.P. 9(b)"); IPPV Enterprises v. Cable/Home Communications, 25 U.S.P.Q.2d (BNA) 1894, 1896 (S.D.Cal.1992) ("Rule 9(b) applies to the defense of inequitable conduct").

Defendants cite Quantum Corp. v. Western Digital Corp., 10 U.S.P.Q.2d (BNA) 1712 (N.D.Cal.1988), for the contrary view that Rule 9(b) does not apply to the defense of inequitable conduct. The Quantum court stated that "[i]nequitable conduct before the Patent Office does not give rise to the level of common law fraud which is the subject of Rule 9(b)." Id. at 1713. The only other case cited by defendants relating to the applicability of Rule 9(b) to inequitable conduct allegations is Scripps Clinic v. Baxter Travenol, 7 U.S.P.Q.2d (BNA) 1562 (D.Del.1988). However, rather than supporting defendants' position, the Scripps court stated "it is unclear whether such a charge [of inequitable conduct] is subject to Rule 9(b). The Court need not decide whether Rule 9(b) applies to charges of inequitable conduct because [the defendant] has met its burden of pleading even under the strict [fraud] standard." Id. at 1563-64.

*3 In light of the weight of authority supporting the applicability of Rule 9(b) standards to inequitable conduct charges, the Court finds that Rule 9(b) pleading requirements do apply to inequitable conduct claims. This finding is especially appropriate in light of the observation by some courts that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." Burlington Industries, 849 F.2d at 1422; see also FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411, 1415 (Fed.Cir.1987) (" 'Inequitable conduct' is not, or should not be, a magic incantation to be asserted against every patentee"); IPPV Enterprises, 25 U.S.P.Q.2d (BNA) at 1896 ("Given the Federal Circuit's frustration with unsupported allegations of inequitable conduct, the weight of authority in favor of applying Rule 9(b) to the defense of inequitable conduct, and the more

1994 WL 43823                                                                                                                Page 3
(Cite as: 1994 WL 43823, *3 (E.D.La.))

persuasive argument that inequitable conduct is a broader form of common law fraud, I find that Rule 9(b) applies to the defense of inequitable conduct"). Accordingly, defendants' allegations of inequitable conduct must satisfy the particularity requirements of Rule 9(b).

3. Sufficiency of Pleadings

Finally, defendants urge that if the Court finds Rule 9(b) applies to claims of inequitable conduct, and if it further finds that the particularity requirements have not been satisfied, that the defendants be allowed to amend their pleadings so as to satisfy the rule. Plaintiff, rather than contest defendants' request to amend, asks that the Court impose specific requirements on any amended pleadings. The Court finds this approach reasonable.

Because the Court finds that the defendants' allegations do not satisfy Rule 9(b), the defendants will be allowed to amend their pleadings so as to more particularly set forth specific acts or omissions which give rise to defendants' charges of inequitable conduct. As a guide, such amended pleadings should identify: (1) the particular statements, misrepresentations, or omissions made; (2) when the complained of acts or omissions occurred; (3) the reason why those acts or omissions were inequitable; and (4) the basis for the belief. Accordingly,

IT IS ORDERED that the motion of plaintiff, the Laitram Corporation, to strike defendants' inequitable conduct allegations (Rec.Doc. 29) be and hereby is GRANTED, and that the Seventh Affirmative Defense in the joint answer filed by OKI America and OKIDATA, the Seventh Affirmative Defense in the answer filed by defendant CompUSA, as well as paragraph 10 of the joint counterclaim by OKI America and OKIDATA, and paragraph 9 of CompUSA's counterclaim, be stricken.

IT IS FURTHER ORDERED that defendants, OKI America, OKIDATA and CompUSA, be allowed twenty (20) days from the date of this order in which to amend their pleadings in conformity with this opinion.

> FN1. OKI America and OKIDATA served a joint answer and counterclaim, whereas CompUSA filed its own separate answer and counterclaim. However, the Seventh Affirmative Defense is identical in both answers.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works